Filed 1/13/16  P. v. Alvarez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESSE DAVID ALVAREZ,<br><br>    Defendant and Appellant. | F064349<br><br>(Super. Ct. No. CF04906686)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  M. Bruce Smith and Wayne R. Ellison, Judges.[†]

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[†]    Judge Smith presided over appellant's trial.  Judge Ellison presided over appellant's motion to dismiss hearings.

## INTRODUCTION

Following his fourth jury trial in approximately seven years, appellant Jesse David Alvarez was found guilty of attempted premeditated murder of Anna P. (Pen. Code, §§ 664/187, subd. (a); count 1)**[1]**; assault with a firearm of Anna (§ 245, subd. (a)(2); count 2); and attempted premeditated murder of Volodia A. (§§ 664/187, subd. (a); count 3). The jury found true firearm enhancements in appellant's attack of Anna (§§ 12022.53, subd. (d), 12022.5, subd. (a)), but they did not find true a firearm enhancement in the attempted murder of Volodia (§ 12022.53, subd. (c)).

For count 1, appellant was sentenced to life in prison with the possibility of parole, plus 25 years to life for a gun enhancement. A consecutive life sentence with the possibility of parole was imposed on count 3. The court imposed sentence on the remaining count and firearm enhancement, but stayed those pursuant to section 654.

Appellant raises two issues on appeal. First, he argues the trial court erroneously refused to dismiss his case before the fourth jury trial in the interests of justice pursuant to section 1385. Second, he contends his fourth trial, when viewed in the context of the entire seven-year prosecution, was fundamentally unfair and violated due process and/or double jeopardy. He asserts that his convictions must be reversed and the case dismissed. In the alternative, and to avoid a finding that forfeiture occurred, he claims his trial counsel was constitutionally ineffective in failing to raise these issues before the trial court.

Appellant's claims are unpersuasive. We affirm.

## BACKGROUND

### I.  Procedural History.

#### A.  The first jury trial.

Appellant's first trial began in October 2005. The court dismissed two counts for

---

**[1]**    All future statutory references are to the Penal Code unless otherwise noted.

insufficient evidence that pertained to a third victim, Volodia's daughter and Anna's younger sister, Diana A. Diana did not testify. The court declared a mistrial when the jury announced it could not reach verdicts on the remaining three counts involving Anna and Volodia. Seven jurors were for guilty and five were for acquittal.

## B. The second jury trial.

The second trial commenced in June 2006. The jury found appellant guilty of attempted murder with premeditation of both Anna and Volodia, and assault with a firearm of Anna. However, the court granted appellant's motion for new trial based on juror misconduct, which the People appealed. On June 15, 2009, this court affirmed the new trial order in a nonpublished opinion. (*People v. Alvarez* (June 15, 2009, F054480).) The matter was remanded for a new trial.

## C. The third jury trial.

In January 2010, a third amended information was filed alleging attempted premeditated murder of both Anna and Volodia (§§ 664/187, subd. (a); counts 1 & 3), and assault with a firearm of Anna (§ 245, subd. (a)(2); count 2). Firearm enhancements were also alleged (§§ 12022.53, subds. (c) & (d), 12022.5, subd. (a)(1)). Prior to trial, the prosecution alerted the court that Anna was unavailable as a witness. Anna's treating physician testified that Anna was pregnant with complications and on bed rest. Her physician opined that Anna's testimony at trial could cause serious trauma to both Anna and her unborn baby. The trial court ruled that Anna was legally unavailable to testify and her testimony from the two previous trials could be presented to the jury.

The third trial began in January 2010. Anna did not testify. The court declared a mistrial when the jury announced it was deadlocked "eight to four" on all three counts.

Appellant's fourth jury trial commenced in July 2011.

3.

## II. Trial Facts From the Fourth Trial.

### A. Prosecution evidence.

#### 1. The shooting.

On September 23, 2004, Anna was in the home she shared with her husband, her father Volodia, her mother, and her sister Diana. Her husband, Gary, was not home but the others were present. Volodia was on house arrest and facing pending federal criminal charges. Anna responded to a knocking on her front security door. A Hispanic male said he was "from the agency" and had a delivery for Volodia. The male was holding envelopes so Anna believed it was a delivery for her father in connection to the federal case. She opened the door and looked at the male, keeping eye contact with him. She noticed that the male had green eyes, dimples that were more pronounced when he spoke, a very light mustache, and a clean shaven bald head. Anna could not remember at trial if the male had "a pimple or two" or an acne scar, but he had "pronounced cheekbones or something about his face." She saw the male's teeth but did not notice anything unusual about them.

Anna said she would be happy to deliver them, but the male insisted on personal delivery. He became aggressive and pushy. She asked to see identification and she took the envelopes from him. The male lifted his shirt and she saw he had a gun tucked into his trousers, which he pulled out. The male shot her in the upper left chest. Anna fled and she was shot twice more through her hand and an ear. She called out for her father.

Diana was in a bedroom when she heard a noise like a glass dropped and broke.[2] She came out and saw a male with a gun and he fired multiple times at her. She ran into a bedroom where her mother was staying. The male followed and tried to enter that bedroom while Diana and her mother tried to hold the bedroom door shut.

---

[2] Diana testified in the third and fourth trials. Both trials occurred after the counts were dismissed that involved her as a victim.

Volodia had been in the backyard when he heard screaming. He ran inside and saw a male pushing on a bedroom door. The male held a gun with an attached silencer in his left hand. Volodia grabbed the male from behind and they struggled. Volodia dragged the male away from the bedroom door and down the hallway. The male broke free and fled out the front door.

Anna's neighbor, Melvin Jamison, heard a sound like firecrackers and he saw a male with a shaved head running from Anna's house. The male jumped into a parked four-door vehicle. Jamison saw three other baldheaded individuals in the vehicle, which drove away. Jamison estimated that the males were between 20 and 25 years old. At trial, Jamison testified that the vehicle seemed to be a light color. However, on cross-examination he admitted he said the vehicle was either light brown or tan when speaking with responding officers on the day of the crime.

Both Diana and Volodia called 911. A responding officer found Anna lying on the floor in the entryway. Although she was in pain and having trouble breathing, she described her assailant as a Hispanic male in his mid to late 20's, and she described his clothing. The officer testified that Anna was conscious, she did not appear confused, but she was in an obvious state of fear. Later that night in the hospital, Anna informed another officer that her assailant was in his late 20's with a shaved head and brown colored eyes. Her attacker had acne scars all over his face and she did not mention dimples. The second officer described Anna as very emotional, but conscious, alert and responsive when she gave her statements. Anna, however, told the jury she could not remember telling the second officer that her assailant had acne scars, and she denied describing brown eyes.

Law enforcement located spent bullet casings and deformed bullets in the house, which established that a .380-caliber handgun had been used. Four envelopes were also discovered on the floor in the entryway. A bullet had penetrated all of the envelopes, making it possible to determine how they were once stacked. Fingerprints from

5.

appellant's left hand and his left palm print were discovered on one of the interior envelopes. The positioning of appellant's prints indicated he did not leave them simultaneously on that envelope, and it was impossible to determine when they were left.

After appellant's fingerprints were discovered, law enforcement prepared a six-pack photographic lineup. Anna picked out appellant as her assailant and told the detective that she was sure. The detective testified that Anna took anywhere from 45 seconds to a "couple minutes" to select appellant's photograph. At trial, Anna testified that appellant's photo immediately jumped out at her, but she thought she should look at all of the pictures to be fair. She looked at the photo next to appellant's picture because that other person appeared to have light colored eyes in the black and white photograph. After looking at other photos, Anna said she knew appellant's photo was correct, as she initially thought. However, Anna later told a district attorney investigator that she had struggled between two people in making her selection, but she told the jury she was very certain she selected the correct photo. A few weeks after the photo lineup, she saw a news report that showed appellant's photograph. Anna felt validated that she had picked the right person.

In court, Anna identified appellant as the person she selected from the lineup and the male who shot her. She confirmed she had testified previously in court and she had been very certain of her past courtroom identification of appellant. Jamison testified he was unable to identify the person who fled from Anna's house. Neither Diana nor Volodia saw the male's face and neither could identify the assailant.

### 2. The car from Riverside, California.

Approximately 30 hours after the shooting, a security guard noticed a dirty vehicle with a broken window parked in an apartment complex in the vicinity of Anna's house. The security officer had not seen the vehicle the night before. He contacted law enforcement after he saw a handgun inside the car. Inside the vehicle, police recovered a cellphone and a .25-caliber handgun with an attached homemade silencer. No

identifiable prints were found in the vehicle, on the gun, or on the cellphone.

The vehicle was a light blue 1984 Honda that belonged to Guillermo Canchola, who had resided in Riverside, California. Canchola died approximately five years before the fourth trial, and his past trial testimony was read into the record. In 2004, Canchola and appellant were neighbors in Riverside. Canchola stored the Honda on a two-acre lot approximately two miles from his house. He left the keys to the Honda under the floor mat. Canchola knew appellant and appellant had visited the lot where the Honda was stored. Canchola, however, had never seen appellant drive the blue Honda, and Canchola did not know the Honda had been taken from the lot until deputies arrived to question him after the Honda was discovered in Fresno.

At trial, Jamison identified a photograph of Canchola's blue Honda as being similar to the one he saw on the evening of the shooting.

### B.   Defense evidence.

Appellant's estranged wife, Nadja Assef, testified that appellant had had a chipped tooth since she first met him in 1987. He had never had acne scars or acne blemishes. She described his eye coloring as greenish and hazel.

Assef had lived with appellant in Riverside. In July 2004, Assef moved to Arizona with their children. Appellant helped with the move and then returned to Riverside to sell the home there. On September 9, 2004, Assef and their daughters returned to Riverside to attend a quinceañera. As they were driving to California, they learned that appellant had been in a motorcycle accident that day, approximately two weeks before Anna's shooting. Assef and the daughters visited appellant in the hospital. Appellant had bandages on his left side and he was in pain.

Appellant was able to attend the party on September 11, 2004, but he needed assistance when dressing and moving. He left early because he was in pain. Both Assef and appellant's daughter testified that appellant returned to Arizona the day after the quinceañera. According to Assef, appellant was unable to care for himself normally due

7.

to his injuries. Assef told the jury that appellant stayed with them in Arizona through approximately the first week of October before he returned to California. According to appellant's daughter, appellant remained in Arizona for two or three weeks. Assef said appellant was still dealing with an infection in his knee, and he still wore bandages on his knee and elbow, when he returned to California. Assef described appellant as not fully recovered when he returned.

Vincenzo Tarantino was Assef's neighbor in Arizona. He moved into that home on September 15, 2004. Approximately one to three weeks later he saw a person with a "burned arm" at Assef's house. He recalled it was a Thursday because he was taking out the trashcans. In court, Tarantino identified appellant as the person he saw at Assef's home and he was "pretty sure" of his identification.

Dr. Scott Fraser testified as an eyewitness identification expert. Based on hypotheticals that matched the facts of the case, Fraser opined it was almost a 100 percent certainty Anna's assailant had acne, a pockmark, or some type of ablation on his face. The fact Anna no longer reported acne was likely due to post-observational influences. Fraser opined that Anna's initial description of brown eyes, which she later changed to green eyes, was also the result of some post-observational influence that altered her memory. He opined that a distinctive cue, like appellant's chipped front tooth, should have been noticed with a high degree of accuracy assuming the tooth was easily seen. Fraser opined that Anna's accuracy would have been high during her initial encounter with her assailant before the gun was produced. Finally, he opined that it was a less than five percent chance she selected the correct photograph in the lineup because she took longer than 12 seconds to make her selection and she struggled between two photos.

Tigran Pogosyan was a resident at the apartment complex where Canchola's blue Honda was discovered after the shooting. In court, Pogosyan identified a picture of Canchola's Honda as a vehicle he had parked behind for up to two weeks without noticing anything unusual about it.

8.

## C.    Rebuttal evidence.

Dr. Venu Gopal, a forensic pathologist, examined appellant's hospital records following his motorcycle accident.  Gopal found no evidence that appellant suffered broken bones.  Appellant had extensive road rash to his left upper extremity, around his knees, on the left top of his body, and he had road rash and an abrasion on his right hand.  Appellant had an injury to his left elbow that required suturing.  Gopal opined that appellant's injuries would typically take 10 days to two weeks to fully heal depending on the infection process and other factors.  Appellant spent one night in the hospital, and his left arm was wrapped in a splint when he was discharged.  Appellant's medical doctors did not place any limitations on him.

Three neighbors and another witness placed appellant in Riverside after the quinceañera.  Jessica Franks stayed with appellant in his Riverside home, assisting him after his motorcycle accident for two or three weeks.  She said appellant did not leave the house during those weeks except for maybe one day, but he was in considerable pain and had difficulty moving around, which lasted less than two weeks.  On cross-examination, however, Franks admitted she was bad with dates and she struggled with drug abuse in 2004, which impacted her ability to remember.  Further, James Olson, the district attorney investigator assigned to the case, testified that he spoke with Franks in 2005, and she indicated she lived in appellant's residence three weeks prior to his arrest.  She then changed her statement and told Olson she started living with appellant two days prior to his motorcycle accident.  In court, Franks could not recall telling Olson that she stayed in appellant's home from October 10 to November 7, 2004.

Ernesto and Sara Arzola, a married couple, previously lived near appellant in Riverside.  The Arzolas attended the same quinceañera and saw appellant there with bandages.  At trial, Sara could not remember if appellant stayed at the Riverside house after the quinceañera.  However, according to Olson, Sara gave a statement in January 2010 saying appellant remained in the Riverside home after the quinceañera while his

9.

wife and children went back to Arizona. She informed Olson that she remembered seeing appellant riding his motorcycle with his arm still wrapped or bandaged after his wife left. At trial, Sara agreed that her statements to Olson were made when events were fresher in her mind and she was as honest then as she could recall. She testified she recalled seeing a young lady staying at appellant's Riverside home for two or three months before the quinceañera. Sara could not recall if the young lady stayed after the quinceañera.

Ernesto saw Assef and her children leave after the quinceañera and he did not see appellant leave with them. Ernesto saw appellant in the Riverside house during the week following the quinceañera. Ernesto saw appellant "just about every day." Ernesto believed appellant remained in Riverside until late October or November. Ernesto, however, previously made a statement to Olson indicating he only saw appellant for about a week after the quinceañera. Ernesto also told Olson that appellant moved out of his house a few weeks before Assef moved to Arizona.

## DISCUSSION

## I. The Trial Court Did Not Erroneously Refuse To Dismiss Appellant's Case.

Appellant contends the trial court erred when it failed to dismiss his case before his fourth jury trial under its discretionary authority pursuant to section 1385. He further argues dismissal was constitutionally required to protect his due process or double jeopardy rights. He seeks reversal of his convictions and dismissal of his criminal charges. We address his section 1385 arguments here and review his constitutional claims in section II.

### A. Background.

In February 2010, appellant began representing himself. He filed a request for the court to consider dismissing the pending charges before his fourth jury trial pursuant to section 1385. In September 2010, following a hearing, the trial court denied the request to consider dismissing the case. Later that month, appellant revoked his Sixth

10.

Amendment waiver and the court appointed new counsel. Appellant's counsel filed a request for the court to reconsider its ruling and dismiss the case. A hearing occurred in July 2011, and the court again denied appellant's request.

During both hearings, the prosecutor argued that the three trials were different. In the first trial, appellant testified on his own behalf and offered evidence regarding his injuries from the motorcycle accident. Appellant had claimed he was physically unable to commit the crimes. The defense also presented evidence suggesting appellant was in Arizona around the time this crime occurred. The prosecution had been surprised by this alibi defense and was unable to refute it. In the second trial, the prosecution addressed appellant's alibi defense, discrediting the severity of appellant's injuries and presenting several witnesses who testified appellant was in Southern California after the quinceañera. After appellant was convicted, jury misconduct led to a new trial order.

In the third trial, Anna was unable to testify in person and her prior transcripts were read to the jury. The prosecutor noted Anna's absence was an issue for some of the jurors, who wanted to see her in person. The prosecutor indicated Anna would be physically able to testify in the fourth trial. No other new evidence would be offered, except an additional rebuttal witness from Southern California could refute appellant's alibi defense. The prosecutor argued appellant was not being retried time after time on the same evidence.

In the first hearing, the trial court cited *People v. Hatch* (2000) 22 Cal.4th 260 (*Hatch*) and *People v. Superior Court* (*Howard*) (1968) 69 Cal.2d 491 (*Howard*) as guiding authority. During the two hearings, the court found that the danger to society was great based on allegations that appellant acted as a hit man, and there was a likelihood of greater punishment. The court noted the weight of evidence was in doubt given the past mistrials. The court, however, determined the prosecution could have one additional trial if Anna testified in person. The court indicated this was not a case involving only eyewitness identification, but the case was "largely dependent" upon

11.

Anna's testimony and the jury needed to personally evaluate her. The court noted the prosecution "would have been better served to have asked for a continuance" in the third trial until Anna was in better health rather than proceed without her. The court, however, determined that the evidence could result in a conviction and it would be a "big step" to dismiss the charges because of the past failures to sustain convictions. The court believed a dismissal would require a finding that the prosecution was only intended to harass appellant, which the court declined to find. At the conclusion of the second hearing, the court determined the balance of factors favored the prosecution so it declined to exercise its discretion and dismiss appellant's pending charges.

B. **Standard of review.**

1. **Section 1385.**

A trial court is authorized in furtherance of justice to order an action dismissed either on its own motion or upon application of the prosecuting attorney. (§ 1385, subd. (a).) It is the trial court, and not the district attorney, that is vested with the power to discontinue or abandon a prosecution. (§ 1386.) A defendant is not authorized to invoke section 1385, but may "informally suggest" that the court consider a dismissal in the interests of justice. The court on its own motion may adopt the suggestion. (*People v. Konow* (2004) 32 Cal.4th 995, 1022.)

A trial court has broad but not absolute power to dismiss an action under section 1385. (*People v. Orin* (1975) 13 Cal.3d 937, 945 (*Orin*).) The trial court is guided by the "amorphous concept" that any dismissal be "'in the furtherance of justice.'" (*Ibid.*) This requires the court to consider both the defendant's constitutional rights and the interests of society represented by the People. (*Ibid.*) The reason for dismissal must be "'that which would motivate a reasonable judge.'" (*Ibid.*) "Dismissals under section 1385 may be proper before, during and after trial. [Citation.]" (*Id.* at p. 946.)

According to our Supreme Court, a trial court must balance approximately five factors when determining whether to dismiss an action. These include: (1) weighing the

12.

evidence indicating guilt or innocence; (2) the nature of the crime involved; (3) whether the defendant has been incarcerated pretrial and its length; (4) the possible harassment and burdens imposed upon the defendant by a retrial; and (5) the likelihood, if any, that additional evidence will be presented at a retrial. (*Orin, supra,* 13 Cal.3d at p. 946; *Howard, supra,* 69 Cal.2d at p. 505.) We will refer to these as the "*Howard* factors." In addition to the *Howard* factors, *People v. Andrade* (1978) 86 Cal.App.3d 963 (*Andrade*) provides two additional considerations for a trial court: the effect on society's protection if the defendant is actually guilty, and the probability of greater incarceration upon conviction. (*Andrade, supra,* at p. 977.)

A trial court should exercise its discretionary powers and grant a dismissal in the interests of justice when the balance falls clearly in favor of the defendant. (*Howard, supra,* 69 Cal.2d at p. 505.) Dismissals before trial have been upheld in order for the prosecution to plead new facts or offenses, add additional defendants, obtain additional witnesses, or to effectuate plea bargains between the People and the defense with the court's approval. (*Orin, supra*, 13 Cal.3d at p. 946.) During trial, a court may dismiss an action against one of several defendants where the prosecutor files a motion and believes the defendant is innocent. It is also settled that a trial court may strike or dismiss a proceeding as to a prior conviction under section 1385 for the purpose of sentencing. (*Orin*, *supra*, at p. 946.)

On the other hand, appellate courts have shown considerable reluctance to grant a dismissal under section 1385 where the People are prevented from prosecuting defendants when there is probable cause to believe they are guilty as charged. (*Orin, supra*, 13 Cal.3d at pp. 946-947.) The appellate courts recognize that society, represented by the People, has a legitimate interest in the fair prosecution of crimes properly alleged and it is an abuse of discretion to order a dismissal which arbitrarily cuts those rights without a showing of detriment to the defendant. (*Id.* at p. 947.) It would be contrary to the adversarial nature of our criminal procedure if trial judges could make liberal use of

13.

section 1385 to dismiss criminal prosecutions where probable cause exists to believe conviction is warranted. (*Orin*, *supra*, at p. 947.)

An appellate court utilizes a deferential abuse of discretion standard when reviewing a trial court's decision not to dismiss an action under section 1385. (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*); *People v. Memro* (1995) 11 Cal.4th 786, 835-836, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra,* 33 Cal.4th at p. 377.)

### C. Analysis.

In the respective briefing, the parties dispute whether dismissal was required under the *Howard* factors and other issues noted by the trial court. Appellant contends the court abused its discretion both under a broad, holistic approach and with a narrower, pinpoint analysis of the issues. He asserts that the trial court affirmatively misunderstood, misapplied, and/or misweighed four particular issues: (1) the nature of the crime involved; (2) the likelihood of additional evidence; (3) the danger to society; and (4) the "relative" incarceration that appellant faced. He contends dismissal is required. We first review each of the *Howard* factors and then we will address appellant's additional arguments regarding the trial court's alleged abuse of discretion.

### 1. The evidence indicating guilt or innocence.

Following appellant's conviction from the second jury trial, this court characterized the evidence against appellant as "strong" but not "overwhelming." Appellant contends the prosecutor presented no significant new evidence to the third jury, which could not reach a verdict, and the prosecutor did not propose to offer any significant new evidence to the fourth jury. He focuses on five evidentiary areas relevant to the shooter's identity and argues the "body of evidence" left "ample room for reasonable doubt." He notes that the total verdicts through the three trials were either 25

to 11 (69 percent) or 21 to 15 (58 percent) for guilty, which shows this was a prosecution far from reaching the required unanimous verdict for criminal conviction. He asserts that the prosecution's strongest showing of guilt was met "at every turn by a great deal of evidence casting equally strong doubt." He contends the evidence of his innocence must weigh "powerfully" in favor of dismissal, especially because the prosecution failed to secure a proper verdict after three trials. We disagree.

### a. Appellant's finger and palm prints.

Appellant's fingerprints and palm print were found on an envelope held by the shooter. Appellant argues the nature of the connection between his prints and the shooter was never clear, noting his prints were not on an outer envelope presumably held in the shooter's hand. Anna testified that the shooter held the envelopes in his right hand, but the prints were from appellant's left hand and the prints were not made at the same time.

Despite these concerns, however, the weight of this evidence did not indicate appellant's innocence. To the contrary, this was circumstantial evidence suggesting appellant was Anna's shooter.

### b. The eyewitness identifications.

Anna consistently identified appellant as her shooter, both in the photographic lineup and at all trials. Appellant concedes that he and the shooter are both Hispanic. He also concedes Anna testified to some features similar to his appearance: green or light eyes, dimpled cheek(s), thin mustache, and his general height range. Appellant describes this evidence as "damning" but argues reasonable doubt existed regarding his identity as the shooter because of numerous other discrepancies in the evidence.

Volodia, who is approximately 5'6", said the assailant was taller and around 5'11", but appellant is 5'9". Anna, Volodia and Jamison all described the assailant as a male in his 20's with either a completely bald head (Anna) or a very short hair length. Appellant, however, was born in 1967 and was not in his 20's when these crimes were committed. Except for Anna, no one described the assailant as having a mustache. The

15.

photographs introduced into evidence show him generally with short visible hair and a light mustache.

In the hospital on the day of her shooting, Anna said her assailant had brown eyes and acne scarring all over his face. Appellant, however, has green or hazel eyes, and no evidence was introduced establishing acne scarring on his face. Appellant questions these obvious discrepancies, noting Anna underwent bank teller training in which she learned to pay special attention to people's characteristics, a practice she attempted to incorporate in her own life. Moreover, defense identification expert Fraser noted that unusual characteristics are most accurately reported. Anna failed to report appellant's chipped front tooth or an apparent hairline scar. She also failed to describe appellant's dimples and mustache during her discussion with the officer in the hospital.

Likewise, appellant questions Anna's photographic identification, contending the lineup was constructed around appellant's photograph and not based on Anna's initial descriptions of her assailant. None of the suspects in the lineup had acne scarring or were in their 20's, and all had facial hair. He notes a factual dispute exists because the detective testified he read Anna an admonishment that her assailant might not be in the photographs, but Anna testified she did not receive any such admonishment. He claims Anna assumed the shooter's picture was in the lineup, and Fraser opined that such an assumption may facilitate misidentification. Appellant also points out that Anna took several minutes to select his photograph, and Fraser opined that identification reliability drops for any selection that takes longer than 10 or 12 seconds. Appellant contends Anna did not know she picked the right person until she saw appellant's picture on a television news story about the crime, and Fraser expected such exposure to dramatically boost a witness's confidence in an identification even though confidence is not correlated with accuracy. Appellant argues memories fade over time, especially regarding complex information such as facial details, but a witness's memory may be altered with post-observational influence.

16.

These arguments are unpersuasive. Assef testified appellant's hair length at the second trial was a little bit longer than he normally wears it and his mustache was "huge." She agreed appellant usually wore his hair shaved or very closely cut. After viewing all of appellant's color photographs in this record, we cannot say it is unreasonable for a person to believe appellant to be in his late 20's. Determining a stranger's age is often difficult even under ideal circumstances. Moreover, although appellant's photographs before the crime show his hair to be very short but visible, those photographs do not depict the length of his hair on the day of the crime. Anna had a clear view of her shooter and interacted with him before the shots were fired.

Moreover, Anna reviewed the photographic lineup approximately a week and a half after the shooting and she testified the shooter's face was still fresh in her mind. The detective did not tell her that the shooter's picture was in the lineup. Anna testified she did not feel that she needed to select someone from the sheet containing appellant's photograph because she believed the detective had other sheets. On cross-examination, Fraser admitted that the "expectation effect" would be reduced if a victim believed other photographic lineups existed.

The weight of this evidence, despite the discrepancies noted by appellant, points to guilt.

### c. The car evidence.

Canchola's Honda, which had been stored in a lot in Riverside approximately two miles from appellant's home, was found in Fresno in the vicinity of Anna's house approximately a day and a half after the shooting. Appellant knew Canchola and had visited the lot where the Honda had been stored. Jamison thought Canchola's vehicle bore a resemblance to the one that sped from the crime scene. Sara Arzola believed she saw a light blue vehicle similar to Canchola's Honda parked in front of appellant's house and in his backyard sometime after he separated from Assef but before the quinceañera.

17.

Respondent argues it would be an "incredible coincidence" for appellant to be innocent but be associated both with a car from Riverside found near the shooting scene and to leave his fingerprints on an envelope held by the shooter. Appellant concedes the evidence surrounding Canchola's Honda suggests guilt.

Appellant, however, argues there were uncertainties surrounding Canchola's Honda and there was no direct evidence connecting him to this vehicle. Sara Arzola admitted she was not good with dates and testified she saw a similar looking vehicle near appellant's house several months before the quinceañera but she never saw appellant driving it. The security officer who discovered Canchola's Honda worked the graveyard shift beginning approximately an hour after the shooting, but he did not see the Honda parked near the complex that night. Alternatively, Tigran Pogosyan saw the Honda parked in the same spot for approximately two weeks. Appellant contends these inconsistencies go against the prosecution's theory that appellant drove Canchola's Honda from Riverside and ditched it after committing the charged crimes.

Although there were questions surrounding Canchola's Honda, appellant's circumstantial connection to this vehicle is compelling. The weight of this evidence, along with his prints on the envelope and Anna's identifications, points to appellant's guilt.

### d.    Motive.

Appellant contends no evidence suggested he had any connection to Volodia, let alone a motive to kill him. He notes the jury was instructed with CALCRIM No. 370 that a lack of motive may be a factor tending to show no guilt. He argues that the absence of motive favored acquittal because the issue was a relative balancing of the evidence and this should be deemed a significant omission. We disagree.

The law generally does not require proof of a motive for criminal conviction. (*People v. Riccardi* (2012) 54 Cal.4th 758, 815; CALCRIM No. 370.) Although we agree a lack of motive is a factor indicating appellant's innocence, we disagree with

18.

appellant's suggestion that this factor should be deemed significant when balancing all of the evidence. In light of the overall record, a lack of evidence regarding motive does not establish that the trial court erred. The totality of the evidence did not suggest appellant's innocence.

### e. Alibi and related evidence.

The defense case tended to show appellant was in Arizona for several weeks starting on September 12, 2004, recuperating from his motorcycle accident. The prosecution attempted to rebut this with testimony from Riverside residents who generally recalled seeing appellant in Riverside after the quinceañera.

Appellant contends the prosecution's rebuttal evidence was not affirmative evidence of his guilt and, at most, created a factual conflict for the jury to resolve. He further notes Franks was impeached with two prior convictions and she admitted her past drug use affected her memory. Appellant argues that Franks's testimony also created reasonable doubt because she testified she lived in appellant's house for perhaps a week after his motorcycle accident, which would have been before the Fresno shooting. Appellant also maintains that Sara Arzola's testimony supported his defense because she testified he was in his Riverside home approximately a month or so after the quinceañera.

However, when this conflicting evidence is weighed, it does not indicate appellant's innocence. To the contrary, the totality of the evidence points to appellant's guilt.

### 2. The nature of the crimes involved.

Appellant concedes that the charged crimes were extremely serious and a factor weighing against dismissal. He argues, however, that the trial court misunderstood the scope of its discretionary power, noting that the court found this to be one of the most serious crimes it had seen, the pending charges represented a great danger to society, and in order to dismiss, the court would have to find that there was no purpose in the prosecution other than harassment. Appellant asserts the trial court abused its

discretionary power because it used this criteria to trump all of the other factors it was required to weigh. We disagree.

The trial court did not focus on this single criteria to the detriment of the other factors. Instead, the court noted the prosecution's interest on behalf of the People to address serious cases. As appellant concedes, the charged crimes were very serious. This record does not establish that the court either improperly considered this factor or overvalued its importance.

### 3. The length of pretrial incarceration.

Appellant points to his very lengthy pretrial incarceration as a factor that should have weighed heavily in favor of dismissal. He maintains that this was an "extremely close case" and, given his length of pretrial incarceration and the three trials he endured, dismissal was required in the absence of any new evidence.

We agree that appellant suffered an unusually lengthy pretrial incarceration. However, we cannot say that the trial court abused its discretion in light of this record when all of the factors are weighed together. The balance does not fall clearly in favor of appellant.

### 4. The possible harassment and burdens imposed upon appellant.

Appellant contends the trial court's refusal to dismiss exacerbated the burdens he faced, noting he hired retained counsel on two separate occasions only to revert back to appointed counsel both times. He points to various appellate decisions that comment on the length of pretrial incarceration as a factor in favor of dismissal. He asserts the prosecutor engaged in harassment through jury "forum-shopping" and pursuit of a verdict that was always in doubt, along with a "pointless" appeal. Because the prosecutor offered no "extraordinary justification" for a fourth trial, appellant maintains the case should have been dismissed.

A trial court is authorized to dismiss an action pursuant to section 1385 if a dismissal would be in the interests of justice. (*Snow v. Department of Motor Vehicles*

20.

(1993) 17 Cal.App.4th 230, 233.) A dismissal is authorized under section 1385 if a court believes harassment of the defendant is the only purpose to be served by a retrial. (*Hatch, supra,* 22 Cal.4th at p. 273.) This is true even when there is sufficient evidence of guilt, no matter how weak. (*Ibid.*)

Here, the trial court determined a fourth trial was not intended to harass appellant. Although we are mindful that appellant faced considerable burdens given his lengthy preconviction incarceration, this record supports the trial court's decision.

### 5.    The presentation of additional evidence.

Appellant concedes that his first trial was distinguishable from the second trial due to the prosecution's rebuttal witnesses. He maintains, however, that the same trial was essentially brought repeatedly and argues the trial court erred because no new significant evidence was proposed for the fourth trial. He contends the prosecutor was permitted to present "piecemeal versions" of evidence to a series of juries, all with the court's blessing. He lists in detail the evidence introduced during the three trials and notes the only real difference in the fourth trial was Anna's proposed live testimony. He notes that Anna's testimony was the primary reason for the trial court's refusal to dismiss, and asserts this was either error as a matter of law or an abuse of discretion because her testimony was not substantial new evidence in light of her trial transcripts. He asserts the prosecutor merely sought Anna's live testimony for its emotional impact. He maintains that the trial court failed to consider the evidence from the first two trials, and concludes that the court's decision created an "illogical loop" where the People could try a defendant forever by using live witness testimony followed by the reading of trial transcripts. On the other hand, he contends Anna's ability to testify in person actually supported dismissal because witnesses frequently become more definite in their testimony over time and more favorable to the prosecution. He asserts the fourth trial was a vehicle used to cure the inadequacy of the State's previous prosecutions, and the concepts of double jeopardy, due process or the interests of justice should have prevented

a fourth trial. We disagree.

"[A] witness's 'demeanor is always relevant to credibility.'" (*People v. Scott* (2011) 52 Cal.4th 452, 493.) Testimony given in the presence of a jury is valued for its probative value regarding credibility because the jury has an opportunity to observe the witness. (*Ohio v. Roberts* (1980) 448 U.S. 56, 63-64, abrogated on other grounds in *Crawford v. Washington* (2004) 541 U.S. 36, 62-64.) A witness's demeanor is "'part of the evidence'" and is "of considerable legal consequence." (*People v. Adams* (1993) 19 Cal.App.4th 412, 438.)

In the context of appellate review, a written transcript of testimony has been described as "a pallid reflection of what actually happens in a trial court." (*Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140.) A transcript cannot provide a witness's look or manner, any hesitations or doubts, any variations of language, any rashness or calmness, or the level of consideration used while testifying. (*Ibid.*) Evaluating the credibility of a witness involves intuition, which is "that intangible, inarticulable capacity of one human being to evaluate the sincerity, honesty and integrity of another human being with whom he comes in contact." (*Id.* at p. 141.)

Here, we agree that Anna's live testimony was the only significant difference between the third and fourth trials. We also agree that the trial court viewed this difference as critical. However, we do not agree that the trial court abused its discretion, ignored the evidence from the first two trials, or rendered a decision that creates an "illogical loop" where the People could try a defendant forever. Per the prosecutor's representations, some of the jurors expressed concern that Anna was not present during the third trial after she was found legally unavailable to testify. Given the importance of Anna's eyewitness identification as the only person who identified appellant as the shooter, it is not unreasonable for the trial court to recognize that her ability to testify in person during the fourth trial was a critical distinction from the previous mistrial. Despite appellant's attempts to establish no difference from Anna's past trial transcripts

22.

and her live testimony, Anna's credibility was a clear issue for the jury to resolve. (CALCRIM No. 226.)

We review the trial court's decision not to dismiss pursuant to section 1385 under a deferential abuse of discretion standard. (*Carmony, supra,* 33 Cal.4th at p. 374.) The trial court diligently reviewed the required factors and balanced both the rights of appellant and the People. When looking at the record as a whole, we cannot say that the court's decision was so irrational or arbitrary that no reasonable person could agree with it. Moreover, we reject appellant's contention that the trial court erred when taking a narrow, pinpoint analysis. The trial court did not misunderstand the scope of its discretion, it did not misapply the law or a relevant factor, it did not rely on a fact not supported by substantial evidence, it did not rely on impermissible factors, and it did not make a record or law-based error. Accordingly, the trial court did not abuse its discretion in weighing the *Howard* factors.

### 6. Other issues noted by the trial court.

In addition to the *Howard* factors enumerated by the Supreme Court, appellant focuses on other issues the trial court commented upon in declining to dismiss the pending charges.

#### a. The prosecutor's responsibility for delay and more trials.

Appellant contends the prosecution's decision to appeal the new trial order while he remained in custody caused needless delay, and the prosecution's tactical decision to appeal should "emphatically" favor dismissal. He maintains the People's appeal was "doomed from the start" and should have never been filed because it had no support in the record, facts or law. While he acknowledges the prosecution was not responsible for Anna's subsequent inability to testify, he asserts the prosecution took that risk when it filed its appeal, noting the prosecution could have sought a trial continuance until Anna was again available. He argues that equity favors dismissal. We disagree.

The People had the statutory right to appeal the order granting a new trial. (§ 1238, subd. (a)(3).) The trial court was aware of the lengthy pretrial incarceration that appellant faced and the additional delay that the appeal caused. The court also questioned why a continuance was not sought when Anna was unavailable to testify. After the court balanced all of these issues, we cannot say its decision was so arbitrary or irrational that no reasonable person could agree with it. The court neither committed error as a matter of law nor abused its discretion.

### b. Danger to society.

Appellant notes the trial court focused on his "danger to society" and contends this was not a Supreme Court factor to analyze. He argues the trial court either improperly considered it or overvalued its importance, all of which was an abuse of discretion. He also contends his danger to society cannot be reconciled with his due-process guarantee that he was to be presumed innocent. These arguments are without merit.

As appellant concedes, the charged crimes were extremely serious. The trial court's comments regarding the potential danger to society were part of its larger discussion regarding the nature of the crime involved, which was a required factor for the court to consider. (*Orin, supra,* 13 Cal.3d at p. 946; *Howard, supra,* 69 Cal.2d at p. 505.) Moreover, the charged crimes represented a clear danger to society. We see no abuse of discretion or error of law for the trial court to make such a comment. The court did not presume appellant to be guilty. To the contrary, the court noted the state of the evidence and recognized this was a close case. The court's actions do not require reversal.

### c. Relative incarceration.

Appellant questions whether the court could properly balance the length of his pretrial incarceration with his potential sentence if convicted. He concedes that such a factor was enumerated in *Andrade, supra,* 86 Cal.App.3d at p. 977, but suggests *Andrade* erred in this pronouncement because this was not a factor set forth in *Howard, supra,* 69 Cal.2d 491. He argues this factor is constitutionally defective to the extent it relies on a

24.

presumption that he was guilty. He cites *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252 (*Morrow*). However, appellant's arguments and reliance on *Morrow* is misplaced.

In *Morrow, supra,* 30 Cal.App.4th 1252, the prosecutor purposefully directed her investigator to eavesdrop on a conversation occurring in a courtroom holding area between the defendant and appointed defense counsel. (*Id.* at p. 1255.) The defendant moved to dismiss because of prosecutorial misconduct, which the trial court denied after finding no prejudice. (*Id.* at pp. 1256-1258.) On appeal, *Morrow* found a due process violation because the prosecutor's actions offended the defendant's federal and state constitutional rights, the prosecutor violated her ethical obligations, and her actions offended a sense of justice. (*Id.* at pp. 1259, 1262-1263.) After finding a due process violation, *Morrow* noted in a footnote the factors cited by *Howard, supra,* 69 Cal.2d 491, 504, as support for its decision that the defendant's motion to dismiss should have been granted. (*Morrow, supra,* 30 Cal.App.4th at p. 1263, fn. 4.)

Appellant focuses on this footnote reference to *Howard*. In that footnote, the *Morrow* court stated it had considered the nature of the crime charged, that the defendant had been incarcerated for approximately one year awaiting trial, the harassment the defendant endured from the prosecutor and her investigator, and the burdens the defendant could face if the case proceeded to trial. (*Morrow, supra,* 30 Cal.App.4th at p. 1263, fn. 4.) Appellant notes *Morrow* did not mention or analyze the length of the defendant's potential sentence versus his actual pretrial incarceration in determining dismissal was required.

Here, unlike in *Morrow*, appellant did not suffer egregious misconduct from a prosecutor who intentionally violated his constitutional rights by directing an investigator to eavesdrop on a privileged communication with defense counsel. Although *Morrow* briefly mentioned the factors from *Howard, supra,* 69 Cal.2d at page 504, *Morrow*'s decision to grant a dismissal turned on the prosecutor's obvious and egregious

constitutional and ethical violations. *Morrow* did not address a trial court's decision to grant or deny a request to dismiss under section 1385 based on multiple jury trials. *Morrow* is distinguishable and does not establish that the trial court abused its discretion.

Moreover, the trial court expressed concern about the length of appellant's pretrial incarceration. The trial court briefly examined the potential length of appellant's sentence if he were found guilty versus the length of his pretrial incarceration. Such consideration is consistent with a duty to examine "the probability of greater incarceration upon conviction of the other offense." (*Andrade, supra,* 86 Cal.App.3d at p. 977.) We decline appellant's apparent invitation to determine that the trial court erred as a matter of law in articulating this factor. Further, this record does not support a finding that the court presumed appellant to be guilty. To the contrary, the court properly considered whether the evidence tended to show appellant's guilt or innocence. (*Orin, supra,* 13 Cal.3d at p. 946; *Howard, supra,* 69 Cal.2d at p. 505.)

Finally, via a supplemental letter dated December 2, 2015, and during oral argument before this court, appellant cited the recent authority of *People v. Charles* (2015) 61 Cal.4th 308 (*Charles*). In *Charles*, the Supreme Court found no abuse of discretion when the trial court granted the prosecution's motion for a fourth penalty trial. *Charles* noted that the trial court carefully laid out and considered each of the factors required of it to reach its decision. The Supreme Court also examined additional arguments raised by the defendant, who contended the trial court gave undue weight to the numerical breakdown of jurors, and it failed to give sufficient weight to his constitutional right "'to be free from undue harassment'" stemming from the continuous litigation. *Charles* rejected these additional arguments, finding no undue weight was given to the juror breakdown and there was proper consideration and denial of the harassment argument. (*Id.* at p. 333.)

Here, the trial court balanced the competing rights and properly exercised its statutory discretion under section 1385 in determining whether appellant's pending

charges should be dismissed prior to the fourth trial. Similar to *Charles,* the trial court laid out and considered each of the factors required of it to reach its decision. Appellant's additional arguments beyond those factors are without merit. *Charles* does not require reversal and an abuse of discretion does not appear on this record.

## II. Appellant's Fourth Trial Did Not Violate Due Process or Double Jeopardy.

Appellant asserts that each successive trial became more fundamentally unfair. He contends that over time the prosecution was able to make the case against him seem stronger than it was. Although he concedes that the number of trials did not violate due process, he contends it is how the prosecutor presented the fourth trial that violated his constitutional rights. He raises serious allegations of intentional prosecutorial misconduct and maintains he suffered a violation of due process and/or protection from double jeopardy.[3]

### A. Appellant has forfeited specific claims of error in the fourth trial.

Appellant asserts four broad alternative theories of error and remedy: the due process right to a fundamentally fair trial; constitutional protections from double jeopardy; the state provision for dismissal in the interests of justice; and the right to effective assistance of counsel. He acknowledges that he did not raise an "unfair trial issue" in the trial court, but raises numerous arguments to establish forfeiture or waiver did not occur so that these claims can be addressed on appeal. In the alternative, he

---

[3] Via motion accompanying his opening brief, appellant requests this court to take judicial notice of its file in *People v. Alvarez*, case No. F054480. Respondent objects to this request, contending primarily that the requested information is not relevant to the issues raised in the present appeal.

On May 16, 2014, this court ordered that appellant's motion for judicial notice be deferred pending consideration of the appeal on its merits. We agree with appellant that the information requested in his motion is relevant to issues he raises in the present appeal. Accordingly, pursuant to Evidence Code section 452, subdivision (d), we grant appellant's motion and take judicial notice of this court's records in *People v. Alvarez*, case No. F054480.

contends his defense counsel was constitutionally ineffective in failing to litigate the "unfair trial" issue.

Respondent argues appellant's contentions should be narrowly viewed as alleged prosecutorial misconduct which was forfeited on appeal for failure to object. Appellant contends respondent's approach mischaracterizes the issues he has raised because many of his "unfair trial" arguments did not involve specific prosecutorial action but raised broader concerns regarding the "metamorphosis" of the evidence from the first trial to the last.

In both criminal and civil cases, the United States Supreme Court will not review a federal claim unless the record establishes that the petitioner presented the state court with the nature and substance of the federal claim at the time and in the manner required by that state's law. (*Webb v. Webb* (1981) 451 U.S. 493, 501.) Likewise, the California Supreme Court generally finds forfeiture, and will not review a claim of federal constitutional error, in the absence of a specific and timely objection made in the trial court. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1260 [defendant's failure to object to a jury instruction or the prosecutor's closing argument forfeited the claim on appeal]; *People v. Romero* (2008) 44 Cal.4th 386, 411 [defendant forfeited on appeal any objection to violations to rules of court or to claims of error relating to interpreters following failure to object]; *People v. Monterroso* (2004) 34 Cal.4th 743, 759 [defendant forfeited claim on appeal after failing to object to the trial court's comments during death-qualification voir dire]; *People v. Burgener* (2003) 29 Cal.4th 833, 869 [defendant waived his constitutional claims on appeal after failing to object that introduction of evidence violated his federal rights to due process and confrontation]; *People v. Hill* (1992) 3 Cal.4th 959, 1000 [a defendant's failure to object and request an admonition for alleged prosecutorial misconduct waives the issue if the objection and admonition would have cured the misconduct], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

The forfeiture rule prevents gamesmanship by the defense and it allows errors to be corrected by the trial court. (*People v. Romero, supra,* 44 Cal.4th at p. 411.) Here, as we analyze each of appellant's claims, we will note as appropriate those specific issues which appellant has forfeited on appeal following a failure to object in the trial court. Regarding those instances, we will also examine whether appellant can establish ineffective assistance of counsel.

**B.      Appellant's double jeopardy rights were not violated.**

Appellant contends the prohibition against double jeopardy required dismissal of his pending charges before the fourth trial. He maintains that the court's refusal to dismiss exacerbated the burdens he faced, destroying the constitutional protections to which he was entitled. He further argues the prosecutor used "new strategies" in the fourth trial and took "unfair advantage" of past mistakes. He claims the prosecutor presented the fourth trial with Anna's live "newly-strengthened testimony" which the prosecutor used "to sway the fourth jury." He relies principally on *Arizona v. Washington* (1978) 434 U.S. 497 (*Washington*) and *Carsey v. United States* (D.C. Cir. 1967) 392 F.2d 810 (*Carsey*)[4] for the principle that double jeopardy shields against grossly unfair multiple trials that increase the risk of conviction. He argues the federal and state Constitutions and "justice" should have prevented the government from taking a "manipulative approach" to his criminal prosecution. These arguments and authorities are unpersuasive.

The double jeopardy clause protects against three concerns: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) against multiple punishments for the same offense. (*Ohio v. Johnson* (1984) 467 U.S. 493, 498.) The prohibition of retrial following

---

[4]      A lower federal court decision is not binding on this court but offers persuasive authority. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58.)

acquittal or conviction "ensures that the State does not make repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence." (*Id.* at pp. 498-499.) The federal Constitution establishes the minimum standards of double jeopardy protection for criminal defendants but the California Constitution, Article I, section 15, may provide for higher levels of protection. (*People v. Batts* (2003) 30 Cal.4th 660, 686.)

Double jeopardy protection does not prevent retrial for an offense when the prior conviction for that same offense has been set aside on appeal. (*Green v. United States* (1957) 355 U.S. 184, 189.) It also does not bar retrial following a mistrial that occurred due to a hung jury. (*People v. Batts*, *supra*, 30 Cal.4th at p. 679.) A defendant's request for a mistrial constitutes a waiver of any double jeopardy claim and there is no double jeopardy bar to retrial. (*Id.* at pp. 679-680.) The federal Constitution bars retrial if, and only if, the prosecution intended the mistrial to occur. (*People v. Batts*, *supra*, at p. 682.)

In *Washington, supra,* 434 U.S. 497, the trial court granted the prosecutor's motion for a mistrial based on improper and prejudicial comments during defense counsel's opening statement. (*Id.* at p. 498.) The *Washington* court examined whether sufficient "'necessity'" existed for the mistrial ruling to avoid double jeopardy. (*Ibid.*) The high court noted that the double jeopardy clause bars a retrial where the judge or prosecutor engaged in bad-faith conduct, the defendant is threatened by harassment of successive prosecutions, or the government takes actions to obtain a mistrial to have a more favorable opportunity to convict the defendant. (*Id.* at p. 508.) *Washington* determined that the trial court did not abuse its discretion in granting the mistrial. (*Id.* at pp. 514-517.)

In explaining the principle of double jeopardy, *Washington* noted the general rule that a prosecutor is entitled to one, and only one, opportunity to try a criminal defendant. (*Washington, supra,* 434 U.S. at p. 505.) A second trial may be grossly unfair due to the

increased financial and emotional burdens, the prolonged stigmatization by an unresolved accusation of wrongdoing, and a second trial could enhance the risk an innocent person is convicted.  Subtle changes in the State's testimony may occur over the course of successive prosecutions.  (*Id.* at pp. 503-504 & fn. 14.)  *Washington* cited with approval the concurring opinion of Judge Harold Leventhal[5] from the United States Court of Appeals for the District of Columbia Circuit in *Carsey, supra,* 392 F.2d 810. (*Washington, supra,* at p. 504, fn. 14.)

In *Carsey, supra,* 392 F.2d 810, the defendant's first two trials ended in hung juries.  The third trial ended when the prosecutor requested a mistrial over a defense objection.  The defendant petitioned against a fourth trial and argued double jeopardy was implicated, but his petition was denied.  He was convicted of murder in his fourth trial and he appealed.  (*Id.* at p. 811.)  *Carsey* found no manifest necessity had existed to declare a mistrial during the third trial.  (*Id.* at p. 812.)  *Carsey* reversed on double jeopardy grounds, finding that the prosecution should not benefit from the prejudice which it created.  (*Ibid.*)

In a concurring opinion, Judge Leventhal reviewed the dangers the double jeopardy clause was intended to prohibit.  The State with all of its resources and power should be prohibited from making repeated attempts to convict an individual for an alleged offense.  Such repeated attempts subject the defendant to an ordeal of embarrassment, expense, a continuing state of anxiety and insecurity, as well as increasing the chance of an erroneous conviction.  (*Carsey, supra,* 392 F.2d at p. 813.) Judge Leventhal noted the defendant on appeal had been confronted with such anxiety and ordeal.  After initially retaining counsel, the defendant had proceeded in forma pauperis presumably due to a depletion of funds.  The defendant had spent over nine

---

[5]     The opinion's heading spells his last name "Leventhal" while the introduction to the concurrence spells it "Levanthal."  For clarity, we adopt the initial spelling.

months in jail and endured 18 days of trial spread out over three proceedings in more than a year. (*Ibid.*) Over the course of the trials, certain government witnesses had altered their testimony to provide more favorable evidence for the prosecution. (*Id.* at pp. 813-814.)

Appellant asks this court to adopt and expand Judge Leventhal's analysis. He suggests we explore "why double jeopardy is a good idea" and to determine how the unique facts of his case establish a violation of double jeopardy or, alternatively, a violation of either due process, the interests of justice, or the right to effective assistance of counsel. He asserts that the retrial process tilted his doubtful case towards conviction. These contentions are without merit.

Both *Washington* and *Carsey* dealt with a mistrial requested by the prosecution. (*Washington, supra,* 434 U.S. at p. 499; *Carsey, supra,* 392 F.2d at p. 811.) In *Washington*, the prosecutor made improper and prejudicial remarks during his opening statement to the jury. (*Washington, supra,* 434 U.S. at p. 510.) The trial court granted the prosecution's motion for a new trial but without expressly finding that there was "manifest necessity" for one. The Ninth Circuit Court of Appeals affirmed a writ of habeas corpus, determining the defendant could not be placed in further jeopardy because the trial judge had failed to find "manifest necessity" for a mistrial. (*Id.* at pp. 501-503.) The Supreme Court, however, determined that the Ninth Circuit attached undue significance to the form of the trial court's ruling, and it reversed. (*Washington, supra,* 434 U.S. at p. 503.) *Washington* found that the trial court acted responsibly and deliberately in affording both parties an opportunity to argue their positions. Because the state trial court exercised sound discretion, the Supreme Court held that its mistrial order was supported by a necessary degree of necessity and it could not be challenged collaterally in the federal courts. (*Id.* at pp. 515-517.)

In contrast, in *Carsey, supra,* 392 F.2d 810, the defendant was tried four times for murder, and he was convicted in the fourth trial. The first two trials ended because the

juries could not agree.  In the third trial, defense counsel referenced the two previous mistrials during closing argument.  The following day, the prosecutor sought a mistrial, which was granted.  (*Id.* at p. 811.)  The *Carsey* court held that double jeopardy barred the fourth trial because no necessity existed to grant the third mistrial.  (*Id.* at p. 812.)  *Carsey* determined that defense counsel's comments were not substantially prejudicial to the prosecution's case.  (*Ibid.*)  *Carsey* reversed on double jeopardy grounds, finding that the prosecution should not benefit from prejudice which it created in seeking a mistrial.  (*Ibid.*)

Here, this record does not establish, and appellant does not contend, that the prosecution intended or created the mistrials.  Both *Washington* and *Carsey* are distinguishable from the present matter and neither case dictates reversal of appellant's convictions.  Appellant's previous trials had ended following two mistrials and an order for a new trial, which was affirmed on appeal.  Double jeopardy did not bar the fourth trial.  Accordingly, we decline appellant's invitation to adopt and expand Judge Leventhal's analysis of that doctrine under the unique facts of this case.

### C.    The fourth trial did not violate appellant's due process rights.

Appellant contends due process required dismissal of his pending charges before the fourth trial.  He further argues his fourth trial was fundamentally unfair in how it was prosecuted, especially in light of the previous trials.  To establish a fundamentally unfair fourth trial, appellant contends the entire seven-year prosecution must be examined, and he relies on *In re Sakarias* (2005) 35 Cal.4th 140 (*Sakarias*) as precedent for this approach.  With multiple citations to *Sakarias* in his opening brief, appellant appears to also rely on *Sakarias* as authority that his fourth trial was fundamentally unfair.  This reliance is misplaced.

In *Sakarias*, two criminal defendants were tried separately and each convicted of first degree murder for the death of the same victim.  During their separate jury trials, the same prosecutor presented factual theories inconsistent with those presented at the

33.

codefendant's trial. The two trials established that both defendants participated in the fatal attack of the victim. The prosecutor falsely attributed to each defendant, in their separate trials, that the respective defendant was responsible for a series of three blows struck to the victim's head with a hatchet. (*Sakarias, supra,* 35 Cal.4th at pp. 144-145.) Our Supreme Court agreed that the prosecutor's intentional presentation of inconsistent and irreconcilable factual theories in the two separate trials violated due process because the prosecutor attributed to each defendant culpable acts that could have been committed by only one person. (*Id.* at p. 145.)

Appellant argues the *Sakarias* court did not limit its review to the isolated record from one trial or the other. Instead, *Sakarias* conducted its review by comparing the two trials in order to determine whether due process was violated. (*Sakarias, supra,* 35 Cal.4th at pp. 147-149.) He urges that we take a similar approach here and review all four of his trial records.

It is appropriate to review appellant's due process claims in the context of the seven-year prosecution because appellant contends the prosecutor committed misconduct in how he presented the fourth trial when compared with the prior trials. However, unlike in *Sakarias*, the prosecutor did not present inconsistent and irreconcilable factual theories in the separate trials. *Sakarias* is factually distinguishable from the present matter and does not dictate reversal.

In a criminal trial, a denial of due process occurs when fundamental unfairness is present. (*Lisenba v. California* (1941) 314 U.S. 219, 236.) Fundamental unfairness rising to a due process violation can occur through a variety of ways, including coerced confessions, or actions by State actors amounting to fraud, collusion, trickery, or subordination of perjury. (*Id.* at pp. 236-237.) A miscarriage of justice can also occur through a series of trial errors which individually do not warrant reversal but cumulatively are prejudicial. (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Prosecutorial misconduct can also create fundamental unfairness. (*People v. Samayoa* (1997) 15

34.

Cal.4th 795, 841 (*Samayoa*).) Prosecutorial misconduct occurs when a prosecutor engages in a pattern of egregious conduct that infects the trial with a level of unfairness, or the prosecutor uses deceptive or reprehensible methods to persuade the trier of fact. (*People v. Maciel* (2013) 57 Cal.4th 482, 541 (*Maciel*); *Samayoa, supra,* 15 Cal.4th at p. 841.)

A prosecutor, however, is permitted to make variations in emphasis between trials without violating due process. (*People v. Richardson* (2008) 43 Cal.4th 959, 1017 (*Richardson*).) In *Richardson*, the defendant was convicted of murder while his accomplice was tried separately. (*Id.* at pp. 970, 1015.) The defendant contended on appeal that the prosecutor violated his due process rights by presenting factually and legally inconsistent theories at his trial and in the trial of his accomplice. (*Id.* at p. 1015.) The *Richardson* court rejected this argument, noting the situation presented in *Sakarias, supra,* 35 Cal.4th 140 was not present. *Richardson* determined the prosecutor proceeded in both cases on the same theory that the defendant was the killer and his accomplice only aided him. (*Richardson, supra,* 43 Cal.4th at p. 1017.) Because inconsistent theories were not used, and because the prosecutor was entitled to make variations in emphasis between the two trials, no due process violation occurred.

Here, the prosecutor did not rely on inconsistent theories. Although the prosecutor made changes in emphasis, a due process violation is not present. Appellant, however, argues Anna's identification of him as the shooter underwent a "metamorphosis" as her testimony regarding her assailant's identity evolved over time to match appellant's appearance. He maintains she became a stronger and better witness with each trial. He points to numerous discrepancies between the fourth trial and the earlier trials. He further asserts that the prosecutor attempted to mislead the jury by knowingly manipulating the evidence and making false arguments in an effort to obtain a conviction. We analyze below each of appellant's concerns.

### 1. The attack on the defense identification expert.

Appellant contends the prosecutor prejudicially misled the jury regarding the defense's identification expert. He alleges the prosecutor ignored or twisted the expert's testimony regarding the "rule of 10 to 12" and improperly branded the expert a liar.

### a. Background.

During the fourth trial, Dr. Scott Fraser testified for the defense regarding eyewitness identification. Fraser explained that the "rule of 10 to 12" was a criteria to judge a witness's probability of correctly identifying a suspect in a lineup. With all criteria being equal, the likelihood of a correct identification is 85 percent or higher when a witness selects a suspect immediately. It is 40 to 60 percent likely an identification was correct when the witness looks at the array of options and considers them for approximately six seconds. If the witness takes 10 to 12 seconds or more, the likelihood is less than five percent. Fraser testified that the longer a witness looks at an array of options the more likely the task changes from selecting a match to selecting the closest match among the group presented. Fraser, however, noted that a witness who takes a considerably long time to select a suspect is not wrong, only that there is a higher probability a wrong choice was made.

Defense counsel presented Fraser with a hypothetical in which a witness spends a minute or more in her selection of a suspect, and the witness said she struggled between one photo and another. Fraser opined the likelihood of a correct selection under that scenario would be less than five percent.

During cross-examination, the prosecutor asked if it was true that a 90 percent accuracy rate occurs when witnesses take 10 to 12 seconds to make their selections, and a 50 percent accuracy rate occurs for those taking more time. Fraser said that was correct based on a study at Cornell University which had "rather optimal conditions" so that it had a "high rate" of correct selections. During Fraser's cross-examination, the prosecutor referred to an unspecified article and asked Fraser if he agreed with those statistics.

36.

Fraser said, "I'm sure you're reading it from the book, from the article, yes." Fraser qualified those statistics, explaining the 50 percent accuracy rate was "the hit rate" and, when the false positives were combined, a five percent accuracy rate was reached.

During closing arguments, the prosecutor stated that the issue of eyewitness identification "is a matter of common sense." He argued that some of what Fraser said was accurate: the lighting conditions, the distance between the witness and the suspect, and the length of time that passed between the people. However, the prosecutor said some of Fraser's testimony was not believable, and "the best lie" has a little bit of truth in it. The prosecutor argued that Fraser's "rule of 10 to 12" was incorrect. The prosecutor contended that witnesses have a 50 percent accuracy rate when identifying a suspect after 12 seconds and not a five percent accuracy rate as Fraser testified. The prosecutor contended Anna immediately recognized appellant's photograph even though she spent more time scrutinizing other photos, and he invited the jury to disregard Fraser's testimony, contending Fraser lied. The prosecutor referenced CALCRIM No. 226, and noted the jurors could disregard a witness's testimony if the witness deliberately lied about something significant in the case, or they could disregard portions of the witness's testimony. He asked the jurors to review Fraser's testimony through their life experiences and use common sense. He argued Fraser was paid by the defense and was used "to get people off."

**b.      Analysis.**

Appellant contends the prosecutor "crossed the line" three times regarding Fraser. First, he argues the prosecutor both mischaracterized the evidence and argued it in a way that materially misled the jury. Second, he asserts the prosecutor unfairly and improperly attacked Fraser as a liar. Finally, he maintains the prosecutor improperly relied upon information outside the record, contending no evidence supported the prosecutor's allegation that Fraser was a liar. We disagree.

Appellant failed to object to the prosecutor's argument in the trial court, resulting in a forfeiture of this claim on appeal. (*People v. Virgil, supra,* 51 Cal.4th at p. 1260; *People v. Hill, supra,* 3 Cal.4th at p. 1000.) This claim also fails on the merits.

A prosecutor commits prosecutorial misconduct when he or she misstates evidence during closing arguments. (*People v. Davis* (2005) 36 Cal.4th 510, 550 (*Davis*).) However, a prosecutor has wide-ranging latitude to discuss the case in closing argument. (*People v. Panah* (2005) 35 Cal.4th 395, 463.) A prosecutor is permitted to fully state his views regarding what the evidence establishes and to urge whatever conclusions he deems proper. (*Ibid.*) A prosecutor is entitled to question an expert's testimonial consistency and possible bias. (*People v. Sandoval* (1992) 4 Cal.4th 155, 180.) A prosecutor may refer to testimony as "'lies'" so long as the prosecutor argues inferences based on the evidence and not on the prosecutor's personal belief. (*Ibid.*) "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*Ibid.*)

Here, the prosecutor urged the jury to use its common sense and disregard Fraser's testimony, which was within the prosecutor's right. The prosecutor was also within his right to offer his views regarding what the evidence established and to urge a contrary conclusion to Fraser's opinion. Moreover, Fraser agreed that the prosecutor's cited percentages were correct but explained why differences existed. Evidence existed in this record from which the prosecutor could disagree with Fraser's opinion. The prosecutor did not materially mislead the jury, rely on facts not in the record, or commit misconduct.

Finally, appellant cannot establish ineffective assistance of counsel regarding his counsel's failure to object to this issue. To establish such a claim, appellant must first show that his counsel's performance was below an objective standard of reasonableness. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051-1052.) However, unless there can be no conceivable reason for counsel's acts or omissions, ineffective assistance of counsel will not be found if the record does not establish counsel's trial tactics or strategic reasons for

the challenged decision. (*Ibid.*) Moreover, an attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero* (2000) 23 Cal.4th 692, 732.)

Here, appellant's claim has no merit so an objection by defense counsel would have been unavailing. (*People v. Lucero, supra,* 23 Cal.4th at p. 732.) Accordingly, appellant's claim of ineffective assistance fails. (*People v. Nguyen, supra,* 61 Cal.4th at pp. 1051-1052.)

### 2. Anna became stronger as a witness.

Appellant argues that Anna, who was the most important witness for the prosecution, became stronger with each passing trial. He concedes that Anna reasonably could be expected to improve as a witness given multiple opportunities to testify, but he contends that did not make her testimony any more accurate or truthful, which the fourth jury would not know. He asserts the court allowed the prosecutor to rely on a new and improved Anna in the fourth trial while he was forced to use "devalued transcripts" for impeachment. He describes this as an unfair burden shift. He maintains that Anna took advantage of the trial court's decision to give the prosecutor yet another chance after the prosecution had three practice swings. He asserts Anna's goal was to become a stronger witness each time, and he argues she gave the jury a reason to believe her 2011 testimony was more valuable than her 2005 version.

Respondent argues that defense counsel had opportunity to cross-examine Anna regarding any changes in her testimony, the reason for those changes, and whether her current testimony was more or less accurate than her previous testimony. Respondent contends appellant presents no authority that due process is violated when a witness becomes less emotional and more able to convey her testimony. Respondent maintains no burden shift occurred, which remained proof beyond a reasonable doubt.

The United States Supreme Court has described cross-examination as "the 'greatest legal engine ever invented for the discovery of truth[.]'" (*California v. Green*

(1970) 399 U.S. 149, 158.) Our Supreme Court has noted the high degree of safeguards resulting from cross-examination and the use of a witness's prior inconsistent statements. (*People v. Zapien* (1993) 4 Cal.4th 929, 953.) The jury is able to learn firsthand why the witness changed his or her story, and which version of events is true and which is false. (*Ibid.*)

Here, defense counsel was free to cross-examine and impeach Anna on all aspects of her testimony, including the topic of her experience as a witness and the degree to which she became less emotional over time. It was for the jury to assess Anna's answers. Appellant was free to argue the jury should disregard Anna's testimony in the fourth trial given the lengthy passage of time and her progression as a stronger witness. This record, when examined in the context of the entire seven-year prosecution, does not establish a fundamentally unfair fourth trial.

### 3. Anna was presented as an expert on identification.

Appellant asserts the prosecutor committed misconduct in misleading the fourth jury regarding Anna's ability to make an identification based on her training or experience as a bank teller. He argues the prosecutor used a jury instruction that was contrary to the evidence which had been developed in the prior trials.

During the fourth trial, a modified version of CALCRIM No. 315 was read to the jury, which asked the jury, in part, to consider whether a witness had "any specific training or experience which would enhance the ability to make an identification[.]" This language does not appear in CALCRIM No. 315. A similar jury instruction regarding witness identification had been read to the three previous juries without this added language.

Anna testified live three times. In the first trial, Anna was briefly asked about her type of work and educational background. She indicated she was in human resources, had a bachelor's degree in business management and was pursuing a master's degree. Later in her direct examination, when asked why she grabbed the envelopes from

40.

appellant's hand, Anna explained her bank teller training taught her to take any note from a robber. She said alarms had gone off in her head.

During the second trial, the prosecutor asked Anna about her work and educational background. Before turning to the facts of the crime, the prosecutor asked Anna if she received any training on how to interact with customers. Anna explained she had been a teller in a bank, which required training on how to deal with customers and what to do if a robbery occurred. Anna said she was to look for specific characteristics in people in order to identify them, and to hold evidence if possible, such as a robber's note. Anna stated this was something she had incorporated into her daily life and habits. She tried to maintain eye contact with people and actively listen to them.

During the fourth trial, the prosecutor again asked Anna questions regarding her training and experience as a bank teller. Anna said she was taught basic expectations, such as eye contact and listening to expectations, and she had incorporated maintaining eye contact in her daily life. The prosecutor asked if she had received training about "high-stress situations" like a robbery, and Anna explained she was taught to be aware of her surroundings, facial characteristics, skin color, height, hair color and any accent the person had to identify the suspect later. The prosecutor asked if Anna had received training involving facial characteristics, and she indicated she had participated in mock robberies and was now a trainer of other employees. She was required to recall details such as a suspect's clothing and to hold on to a demand note if possible.

The defense elicited testimony from identification experts in all of the trials except the second. During cross-examination in the first trial, the defense identification expert, Dr. Robert Shomer, indicated only a small group of people, such as secret service agents, can undergo training in order to be better at identifying people. He noted it required special training and involved people who spent many hours each day studying faces. Shomer agreed that a person could enhance their ability to recall a face, even under stressful conditions, through training. Shomer also agreed that if a person was focusing

41.

on a subject's face it would result in a more accurate identification, and the longer the person interacted with the subject, a more detailed description would occur.

In the third trial, a different defense identification expert testified, Dr. Scott Fraser. He agreed with the prosecutor that people with different training and aptitudes will be better at recalling events, but he noted no scientific study had ever established that a training procedure was associated with more accurate facial recognition. Fraser explained that facial recognition is "largely hard wired" into people, and someone who works often with people's faces, like a cosmetologist, would be no better at recognizing a stranger. Fraser disagreed that people could improve their ability to recognize faces through training. He did not know of any research showing the training programs tried by banks, retail outlets, or law enforcement improved facial recognition and, instead, he believed such programs usually decreased accuracy.

In the fourth trial, Fraser again testified as the defense identification expert. During the last trial, neither defense counsel nor the prosecutor asked Fraser about the effects of training on facial recognition. During closing arguments, the prosecutor emphasized that Anna had been absolutely clear that appellant was her shooter when she both testified in court and in her contact with law enforcement. The prosecutor stated that some of what Fraser said was common sense, and he reviewed the factors outlined in CALCRIM No. 315 regarding eyewitness identification, including the additional language regarding the effect of any specific training or experience which could enhance an identification.

Appellant contends the fourth jury did not learn about Fraser's earlier opinion that training does not improve facial recognition. He argues the prosecutor intentionally misled the jury by using the modified language in CALCRIM No. 315, asserting the prosecutor knew that instruction was directly undermined by evidence developed in the earlier trials. He maintains the prosecutor urged an improper inference, contending the prosecutor suggested that Fraser had endorsed the training point which Fraser had

42.

previously rejected. He maintains the jury could have reasonably misconstrued or misapplied the prosecutor's statements. He also questions the additional time the prosecutor spent in the fourth trial establishing Anna's background, believing Anna was presented as if she were an expert witness. Finally, he argues Anna's training actually supported the defense theory that she initially described someone else, but the prosecutor unfairly transformed this weakness for the People into a major asset. Coupled with the modified jury instruction, the jury was urged to find that the training enhanced Anna's ability to ultimately identify appellant. We disagree.

Appellant's failure to object to either this instruction in the trial court, or the prosecutor's argument, forfeits this claim on appeal. (*People v. Virgil, supra,* 51 Cal.4th at p. 1260.) The record reveals a very plausible tactical reason why defense counsel did not object to either the modified jury instruction or the prosecutor's arguments. Defense counsel argued in summation that Anna's initial descriptions of the shooter were accurate, and she described someone other than appellant. Defense counsel noted the inconsistency in the prosecution's case in that Anna's training supposedly made her better at identification but the prosecutor told the jury to disregard her original descriptions to law enforcement. The tactics of this defense approach at trial is evident and negates an ineffective assistance claim. (*People v. Nguyen, supra,* 61 Cal.4th at pp. 1051-1052.)

Moreover, this claim fails on the merits. Prosecutors have a "solemn obligation to present evidence only if it advances rather than impedes the search for truth and justice." (*People v. Seaton* (2001) 26 Cal.4th 598, 649.) A prosecutor represents the sovereignty whose interest in a criminal case is obtaining justice and not winning a case, and a prosecutor cannot be the architect of a trial that does not match the standards of justice. (*Id.* at pp. 649-650.) However, a prosecutor is permitted to offer an opinion regarding the state of the evidence, and he or she has wide latitude to comment on a witness's

credibility and quality. (*People v. Padilla* (1995) 11 Cal.4th 891, 945, overruled on another point in *People v. Hill*, *supra*, 17 Cal.4th 800, 823, fn. 1.)

An expert's opinion is treated differently than any foundational fact underlying it. (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923.) The law does not give the same degree of credence or integrity to an expert's opinion as it does to the data underlying the opinion. (*Ibid.*) A jury may disregard an expert's opinion, even if uncontradicted, and draw its own inferences from the facts. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83; *Kennemur v. State of California, supra,* 133 Cal.App.3d at p. 923; CALCRIM No. 332.) Moreover, if the facts underlying the expert's opinion are proved to be false or nonexistent, the expert's opinion is destroyed and that falsity permeates his or her entire testimony, calling into question the truthfulness of the expert's testimony. (*Kennemur v. State of California, supra,* 133 Cal.App.3d at pp. 923-924.)

Here, the prosecutor argued witness identification was a matter of common sense. The prosecutor was within his right to offer his opinion on the state of the evidence, to question Fraser's opinion testimony, and to ask the jury to reject Fraser's opinions. This record does not establish that the prosecutor suggested Fraser had endorsed Anna's training. Further, we disagree with appellant that the prosecutor's remarks were ambiguous requiring an analysis into whether there was a reasonable likelihood the jury misconstrued or misapplied his words.

Via a supplemental letter dated December 2, 2015, and during oral argument before this court, appellant cited three recent opinions supporting his arguments: (1) *United States v. Vera* (9th Cir. 2014) 770 F.3d 1232 (*Vera*); (2) *United States v. Torralba-Mendia* (9th Cir. 2015) 784 F.3d 652 (*Torralba-Mendia*); and (3) *United States v. Haines* (5th Cir. 2015) 803 F.3d 713 (*Haines*). These authorities do not dictate reversal.

In *Vera, supra,* 770 F.3d 1232, the Ninth Circuit Court of Appeals found error when the trial court failed to instruct the jury on how to appropriately evaluate a law

44.

enforcement officer's dual testimony as both an expert and lay witness. (*Id.* at p. 1243.) *Vera* noted that dual capacity testimony was problematic because the agent's status as an expert could give him unmerited credibility when testifying as a percipient witness, cross-examination could be inhibited, jurors could be confused, and the agent might be more likely to rely on hearsay and stray from reliable methodology. (*Id.* at p. 1242.) *Vera* vacated the jury's drug quantity findings because the jury was not instructed on how to evaluate the officer's opinions, which were also given without adequate foundation. (*Id.* at pp. 1243-1244.)

In *Torralba-Mendia, supra,* 784 F.3d 652, the Ninth Circuit Court of Appeals found error when the trial court failed to instruct the jury regarding a federal agent's testimony as both an expert and percipient witness. (*Id.* at p. 661.) The error, however, was not prejudicial because the agent's testimony was bifurcated between his expert testimony and percipient observations, he provided an adequate foundation for most of his observations, and a substantial amount of evidence, aside from the agent's testimony, connected the defendant to the crime. (*Id.* at pp. 661-662.)

Lastly, in *Haines, supra,* 803 F.3d 713, the Fifth Circuit Court of Appeals determined that the trial court properly qualified a drug investigator as an expert. (*Id.* at p. 727.) *Haines*, however, found error because the drug investigator's testimony was frequently blurred between his knowledge of drug crimes in general and his percipient knowledge of the conspiracy in this case. The government and the court did not adequately clarify for the jury that the witness gave percipient testimony regarding the meaning of certain words and phrases used in this conspiracy, but which were not used in the broader drug trade. The jury would not have known whether this was expert or lay testimony. However, the error was deemed harmless because other adequate evidence established that the defendants participated in the conspiracy. (*Id.* at pp. 733-734.)

Here, unlike the law enforcement agents in *Vera*, *Torralba-Mendia*, and *Haines*, Anna was never qualified as an expert witness and the jury was never instructed to treat

her as one. Unlike the juries in *Vera*, *Torralba-Mendia*, and *Haines*, the jury here was not presented with conflicting testimony that blurred the distinction between expert knowledge and percipient observations. To the contrary, Anna testified as a percipient witness and her identification of appellant stemmed from her direct interactions with him. *Vera*, *Torralba-Mendia*, and *Haines* are factually distinguishable and do not dictate reversal. The jury was instructed to consider all of the factors underlying Anna's identification to determine whether her identification was credible or not. The prosecutor did not materially mislead the jury or commit misconduct regarding how it presented or argued Anna's training.

### 4. Anna's testimony underwent a metamorphosis.

Appellant points to numerous inconsistencies in Anna's testimony occurring over the trials, contending her descriptions of her assailant moved exclusively towards guilt. He maintains that both Anna and the prosecutor "clouded the picture" over the four trials regarding Anna's interactions with police, and her testimony evolved over time regarding the photographic lineup. He asserts it was fundamentally unfair to face such evolving testimony in the numerous trials, and contends the prosecutor took advantage of Anna's changing testimony. Despite arguably describing the wrong person to two officers, and despite the defense expert's opinion that initial descriptions are more likely accurate, Anna became a "trained" eyewitness who gave the jury a reason to doubt the accuracy of her initial descriptions. Appellant maintains that this resulted in an unfair presentation of evidence that evolved not from investigation but through repeated opportunities for the prosecution to present its case. He relies on *United States v. Chapman* (9th Cir. 2008) 524 F.3d 1073 as authority that dismissal is the proper remedy where retrial would give the government an unfair advantage. This reliance and his arguments are unpersuasive.

In *United States v. Chapman, supra,* 524 F.3d 1073, the prosecutor failed to disclose approximately 650 pages of documents to the defense, which came to light during the third week of trial. (*Id.* at pp. 1078-1079.) The trial court declared a mistrial.

Following a hearing, the court granted a defense motion to dismiss the indictment, and the government appealed. (*Id.* at p. 1080.) The Ninth Circuit Court of Appeals determined the trial court did not abuse its discretion in declaring the mistrial, and double jeopardy did not bar retrial. However, the Ninth Circuit found no abuse of discretion in the dismissal of the indictment. (*Id.* at pp. 1083-1084.) It noted that a trial court may dismiss an indictment when a defendant suffers substantial prejudice and no lesser remedial action is available. The Ninth Circuit affirmed the lower court's finding that another trial would only advantage the government, which conducted a poor prosecution with myriad weaknesses. A retrial would allow the prosecution opportunity to correct its mistakes, and its witnesses would be subsequently stronger. Accordingly, a dismissal was the only means of avoiding prejudice to the defense. (*Id.* at p. 1087.)

Here, unlike in *United States v. Chapman, supra,* 524 F.3d 1073, the prosecution did not engage in discovery violations resulting in a mistrial. Although the case against appellant was not overwhelming, the prosecution did not prejudice appellant's defense before seeking a retrial. *United States v. Chapman* is distinguishable and does not dictate reversal.

Appellant concedes he could and did impeach Anna's testimony with her prior inconsistent statements. He argues, however, that the fourth jury did not see the earlier version of Anna, but a less emotional and more accurate witness. He insists that dismissal is the proper remedy because the retrial gave the prosecution an unfair advantage.

However, it was the jury's exclusive role to judge this, and all other, disputed facts and determine Anna's credibility. (§ 1127; CALCRIM No. 200.) Appellant was not prevented from vigorous cross-examination, the greatest device to discover truth, to alert the fourth jury regarding inconsistencies in Anna's statements to law enforcement and her trial testimony. Our Supreme Court has noted the high degree of safeguards resulting from cross-examination and the use of a witness's prior inconsistent statements. (*People*

*v. Zapien, supra,* 4 Cal.4th at p. 953.) The fourth jury was able to learn firsthand why Anna changed her statements, and which version of events was true. A due process violation does not appear on this record based on Anna's alleged metamorphosis as a witness.

### 5. Diana's testimony.

Diana was originally a named victim in the charges against appellant, but she did not testify in the first trial. Based on insufficient evidence, the trial court dismissed the two counts regarding Diana. Diana did not testify in the second trial, but she testified in both the third and fourth trials, stating that the assailant shot at her multiple times. Diana was unable to identify the shooter because she did not see his face.

During closing arguments in the fourth trial, the prosecutor referred to the "ruthlessness" and "callousness" of appellant's actions. The prosecutor noted that appellant did not look like a killer, but argued this type of crime required someone who could look presentable at the door in an effort to gain entry. The prosecutor said appellant made a choice to shoot Anna and appellant fired at point-blank range at Diana when he heard her calling out. The prosecutor argued all of the evidence pointed to appellant. The prosecutor asked the jury to put their emotions aside, and render a verdict based on the evidence and law.

Appellant asserts that the only issue in the fourth trial was the shooter's identity. He contends that the prosecutor over-proved his case with cumulative evidence that risked undue prejudice because Diana was unable to identify the shooter and the prosecutor had no need for her testimony. He questions why the prosecutor would argue about appellant's "ruthlessness" and "callousness" in attacking Diana, along with Anna and Volodia. He argues that even if Diana's testimony was properly admitted, the prosecutor used it improperly to inflame the jurors' passions. He maintains that the jury would have presumably been aware no one "would pay" for the attempted murder of Diana. We disagree.

Appellant's failure to object to the prosecutor's argument forfeits this claim on appeal. (*People v. Virgil, supra,* 51 Cal.4th at p. 1260; *People v. Hill, supra,* 3 Cal.4th at p. 1000; *People v. Burgener, supra,* 29 Cal.4th at p. 869.) This claim also fails on the merits.

A prosecutor is not required to discuss a case in a detached or clinical way. (*People v. Tully* (2012) 54 Cal.4th 952, 1021.) It is also not necessarily misconduct for a prosecutor to use derogatory epithets to describe a defendant. (*People v. Friend* (2009) 47 Cal.4th 1, 32 [defendant described as "'living like a mole or the rat that he is'"].) A prosecutor may make vigorous arguments, including epithets warranted by the evidence, so long as the arguments are not inflammatory and principally designed to arouse the jury's passion or prejudice. (*People v. Tully, supra,* 54 Cal.4th at p. 1021.)

Our Supreme Court has repeatedly rejected claims of prosecutorial misconduct involving the use of epithets during closing arguments. (*People v. Tully, supra,* 54 Cal.4th at p. 1021; see, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized crimes as "'serial killing,'" and "'terrorizing and killing'" people (italics omitted)]; *People v. Jones* (1998) 17 Cal.4th 279, 308-309 [no ineffective assistance of counsel for failure to object to prosecutor's characterization of defendant's crime as a "terrorist attack" and comparison of defendant to "[t]errorists"]; *People v. Medina* (1995) 11 Cal.4th 694, 777-778 [no misconduct where prosecutor indicated during closing arguments that it was impossible to recreate "'the terror, the violence'" during the defendant's crime spree]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250-1251 [no misconduct where prosecutor referred to the defendant as a "'perverted maniac'"].)

Here, the prosecutor's comments were part of a discussion that appellant was capable of being the shooter despite not looking like a killer. Diana's testimony was proper because it linked the chronology of events. The words "ruthlessness" and "callousness" do not exceed the bounds of proper argument as they were part of vigorous

49.

summation warranted by the evidence. This record does not demonstrate that the prosecutor's comments were intended to inflame or were designed principally to arouse the jury's passion or prejudice. To the contrary, the prosecutor advised the jury to put their emotions aside, and render a verdict based on the evidence and law. The prosecutor's comments were fleeting characterizations in the course of lengthy summations, and they do not establish misconduct. (*People v. Tully, supra,* 54 Cal.4th at p. 1021.)

Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel. An attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero, supra,* 23 Cal.4th at p. 732.)

### 6. How the photographic lineup was prepared.

Appellant raises concerns regarding how the photographic lineup was constructed, arguing it was prepared solely around his appearance and not based on the victims' descriptions of the suspect. He asserts the prosecutor misled the fourth jury regarding how law enforcement prepared the photographic lineup through which Anna identified him as her assailant.

During the fourth trial, the prosecutor asked the detective how he prepared the photographic lineup. The following exchange occurred:

> "[Prosecutor]: Okay. Did you have a certain thought process in your placement of [appellant] in position five?
>
> "[Detective]: You know, we kind of ran this around with the guys in the office and nobody had a real set way to do it. Some guys said don't ever put him in four, some guys said don't ever put him in one. I just -- I just put him in five.
>
> "[Prosecutor]: So did you actually -- before showing anyone this lineup, did you talk to the other detectives?
>
> "[Detective]: Yes.

"[Prosecutor]: Okay. So did any of them raise issues with you about your choice of people in these photographs?

"[Detective]: No.

"[Prosecutor]: I mean, I'm sorry, the people you chose to use in the lineup?

"[Detective]: No.

"[Prosecutor]: Okay. What about the subject of photocopying the color photographs?

"[Detective]: It was most likely one of their suggestions to do that."

On cross-examination, the detective said others in his department did not have a problem with the position of appellant's photograph. He received different theories regarding whether or not a suspect's photo should be placed in the middle because people naturally focus there. He was told, however, to do the lineup how he wanted. The detective thought appellant's original color photo stood out too much.

During closing arguments in the fourth trial, the prosecutor noted that the detective prepared a lineup using people with similar characteristics as appellant. At that point, "[the detective] talked to the other detectives, everybody kind of -- this is not something where he's just cowboying it on his own, they talked about it, they say, no, you know what, this is -- there is a problem here, too suggestive, it's going to immediately draw her attention to [appellant's photograph] . . . ."

Appellant asserts that the prosecutor's message went against the facts from the previous trial and the prosecutor wanted to establish that the detective received some "professional input" regarding the lineup. He contends the evidence showed the detective was the sole decider and actor in creating the lineup, although he may have received some "unclear input" from others. Appellant argues the prosecutor's approach was in error because it (1) improperly mischaracterized the evidence; (2) relied on what unidentified non-witnesses purportedly said and did; (3) was materially misleading; and

51.

(4) the prosecutor took unfair and manipulative advantage through four trials against appellant.

As an initial matter, appellant has forfeited this claim on appeal following a failure to object in the lower court. (*People v. Virgil, supra,* 51 Cal.4th at p. 1260; *People v. Burgener, supra,* 29 Cal.4th at p. 869; *People v. Hill, supra,* 3 Cal.4th at p. 1000.) This claim also fails on the merits.

The record does not support appellant's arguments. In the first three trials, the prosecutor did not ask the detective if he received input from others. On cross-examination, however, the detective indicated others in his office gave him suggestions where a suspect's photo should be positioned in a lineup. Further, the detective testified in the fourth trial that someone likely suggested making a photocopy of the original color photographs. The prosecutor did not misstate or mischaracterize the evidence, and his comments were neither misleading nor manipulative.

Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel. An attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero, supra,* 23 Cal.4th at p. 732.)

### 7. Jessica Franks remembered that appellant had a scar.

Jessica Franks testified in the last three trials as a rebuttal witness. During the second and third trials, Franks was not asked to describe if appellant had anything distinctive about his face. However, the prosecutor posed such a question to Franks during the fourth trial, and she said she thought appellant had a facial scar. She admitted, however, that she could not see a facial scar on appellant in court as she testified.

At the end of that day's session, the parties announced a proposed stipulation that Franks had never previously testified about a scar on appellant's face. The court instructed the parties to be ready with the stipulation in the morning. However, the parties never reached a stipulation and Franks was never recalled to testify. After both parties rested and outside the presence of the jury, appellant personally lodged an

objection with the court that the prosecutor failed to recall Franks and no stipulation was ever reached. The court noted it could not force a stipulation between the parties.

During closing arguments, the prosecutor did not reference Franks's memory of a scar on appellant's face. Defense counsel asked the jury to consider why Franks would mention a facial scar if it did not exist, noting the jurors could see for themselves that appellant had no facial scarring.

Appellant contends the prosecutor was responsible for introducing this "odd and unreliable piece of evidence" and then neither agreeing to a stipulation nor recalling Franks to the witness stand. Appellant speculates that the jury might have given weight to Franks's testimony and believed it was the same acne-scarred face that Anna initially reported to law enforcement. This argument is unpersuasive.

Appellant has forfeited this claim on appeal following a failure to object in the lower court. (*People v. Virgil, supra,* 51 Cal.4th at p. 1260; *People v. Burgener, supra,* 29 Cal.4th at p. 869; *People v. Hill, supra,* 3 Cal.4th at p. 1000.) Moreover, this claim has no merit.

The prosecutor did not mention this statement during closing argument and did not use this evidence in an effort to convict appellant. This record does not establish deceptive or reprehensible methods used by the prosecutor to convict appellant. (*Maciel*, *supra*, 57 Cal.4th at p. 541; *Samayoa*, *supra*, 15 Cal.4th at p. 841.) Prosecutorial misconduct is not present and a due process violation did not occur.

Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel. An attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero, supra,* 23 Cal.4th at p. 732.)

**8.      The opening statement regarding Canchola's vehicle.**

During opening statements in the fourth trial, the prosecutor told the jury that appellant had shown interest in purchasing Canchola's Honda and appellant had looked at the Honda. During closing arguments, however, the prosecutor admitted there was no

such evidence. Appellant asserts the prosecutor committed misconduct in providing this opening statement. He concedes his defense counsel failed to object or request an admonishment, but asserts his counsel was constitutionally ineffective for not doing so. He contends the jury would have reasonably understood the prosecutor knew from some other source that appellant had taken steps to buy the Honda from Canchola. He argues this part of the prosecutor's opening statement filled a major hole in the prosecution's case and a juror cannot be expected to pretend it made no difference.

As an initial matter, appellant has forfeited this claim on appeal following a failure to object in the lower court. (*People v. Virgil, supra,* 51 Cal.4th at p. 1260; *People v. Burgener, supra,* 29 Cal.4th at p. 869; *People v. Hill, supra,* 3 Cal.4th at p. 1000.) Moreover, this claim fails on its merits.

We disagree that this opening remark established reversible error. Even when we presume, without so deciding, that this statement amounted to misconduct, it was not prejudicial. Prosecutorial misconduct during an opening statement is not grounds for reversal unless the defendant was denied a fair trial because of the prosecutor's egregious or prejudicial conduct. (*People v. Harris* (1989) 47 Cal.3d 1047, 1080.)

Here, before opening statements were given, the trial court admonished the jurors that the attorneys' comments were not evidence. Approximately 13 days after making these opening comments, the prosecutor informed the jury during closing arguments that no evidence established appellant had seen Canchola's Honda and was interested in it. Given the passage of time and the judge's admonishment, it is not reasonable to believe the jurors would have continued to give weight or credence to these opening comments.

Further, sufficient evidence was introduced during the fourth trial to connect appellant to Canchola's Honda. The Honda was stored on a lot near appellant's residence in Riverside, and appellant had visited that lot. The Honda was later located in Fresno in the vicinity of the shooting. Even assuming misconduct occurred, it was not of a nature that requires reversal to protect appellant's rights to a fair trial. (*People v. Harris, supra,*

47 Cal.3d at p. 1080.)  Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel.  An attorney is not deemed incompetent when he or she fails to lodge meritless objections.  (*People v. Lucero, supra,* 23 Cal.4th at p. 732.)

### 9.    Arguing appellant was hired to kill.

Appellant contends the prosecutor improperly argued to the fourth jury that appellant was hired to kill Volodia.  He asserts no evidence established his motive to kill, the prosecutor's argument was speculative, and he maintains jurors would have believed the prosecutor had information that appellant was hired to kill Volodia.  He concedes his defense counsel did not object to the prosecutor's argument, but alleges his counsel was constitutionally ineffective for not doing so.  This contention is without merit.

Appellant has forfeited this claim on appeal following a failure to object in the lower court.  (*People v. Virgil, supra,* 51 Cal.4th at p. 1260; *People v. Burgener, supra,* 29 Cal.4th at p. 869; *People v. Hill, supra,* 3 Cal.4th at p. 1000.)  Moreover, this claim fails on its merits.

Sufficient evidence was presented in the fourth trial to support the prosecutor's argument that appellant was hired to kill Volodia.  Anna identified appellant as the male who knocked on her door and asked for Volodia by name.  Volodia was on house arrest and facing pending federal criminal charges.  The male held envelopes and said he was from "the agency" with a delivery for Volodia.  Anna believed it was connected to the federal case.  She offered to deliver the envelopes but the male insisted on a personal delivery.  When Anna objected and took the envelopes, the male produced a gun, shot her and proceeded into the house.  Appellant's prints were left on one envelope.

Further, approximately three or four weeks prior to this shooting, two African-American men knocked at Anna's house.  Her husband, Gary, answered the door and the men asked for Volodia by name.  They said they had a delivery from the agency and one of them held an envelope.  Gary was home alone and the men left when Gary said

Volodia was not there. The men left in a vehicle similar to an older 1985 Toyota Camry that was dark in color.

Based on these facts, a reasonable inference exists that appellant was sent to kill Volodia. The prosecutor was permitted to infer a motive from the evidence and it is the jury's domain to determine if that inference was logical or not. (*People v. Washington* (1969) 71 Cal.2d 1061, 1085.) Further, because the prosecutor was within his right to make such an argument, the failure of appellant's counsel to make a futile or unmeritorious motion or objection does not establish ineffective assistance. (*People v. Lucero, supra,* 23 Cal.4th at p. 732.)

### D. Appellant cannot establish cumulative error.

Appellant suggests he suffered a due process violation from cumulative errors. This contention is without merit because we have rejected all of his claims. Accordingly, reversal is not warranted. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [the defendant's cumulative prejudice argument rejected based on findings each individual contention lacked merit or did not result in prejudice].)

### DISPOSITION

The judgment is affirmed.

_____

LEVY, Acting P.J.

WE CONCUR:


_____

GOMES, J.


_____

POOCHIGIAN, J.